IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.    **06 - CV - 00451**

(To be supplied by the court)

MARY J TURTON                              ,

Plaintiff,

v.

GALE NORTON SECRETARY, US DEPARTMENT    ,
OF THE INTERIOR

Defendant.

---

## TITLE VII COMPLAINT

---

### PARTIES

1. Plaintiff   Mary J Turton                  is a citizen of   the United States of America
   who presently resides at the following address:
   6108 Stonebrook Drive, Sanford FL  32773

2. Defendant  Gale Norton, Secretary, US Department    lives at or is located at the following address:
               of the Interior
   Office of the Solicitor, Rocky Mountain Region, 755 Parfet Street, Suite 151, Lakewood CO  80215

Attach a separate page, if necessary, to list additional parties.

### JURISDICTION

3. Jurisdiction is asserted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.
   § 2000e-5.

4. Defendant is an employer within the meaning of Title VII.

5. The alleged unlawful employment practices took place at the following location:
   Minerals Management Service, Lakewood CO

6. Jurisdiction also is asserted pursuant to the following statutory authority:

### ADMINISTRATIVE PROCEDURES

7.  Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission or other appropriate administrative agency on _August 26. 1998_____ (date) regarding the alleged discriminatory conduct by Defendant(s).

8.  Plaintiff received from the Equal Employment Opportunity Commission or other appropriate administrative agency a Notice of Right to Sue the Defendant(s) on _December 19, 2005_____ (date).  (Please attach to the complaint a copy of the Notice of Right to Sue.)

## NATURE OF THE CASE

9.  Defendant has discriminated against Plaintiff because of the following: (please check all that apply)

|   | Race |   | Color |   | Religion |
|---|------|---|-------|---|----------|
| X | Sex |   | National Origin |   |   |
| X | Other (please specify) |   | Hostile work environment and retailiatory harassment |   |   |

10. Defendant has discriminated against Plaintiff because of the following: (please check all that apply)

    Failure to hire

    Failure to promote

    Demotion/discharge from employment

    Other (please specify)

## FIRST CLAIM FOR RELIEF
## AND SUPPORTING FACTUAL ALLEGATIONS

(Please number your paragraphs and attach any necessary additional pages.
Alternatively, you may attach to the complaint a copy of the charge of discrimination
you submitted to the Equal Employment Opportunity Commission.)



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Denver District Office**

## ADMINISTRATIVE JUDGE'S DECISION IN THE EMPLOYMENT DISCRIMINATION COMPLAINT OF MARY J. TURTON v. GALE A. NORTON, SECRETARY, U. S. DEPARTMENT OF THE INTERIOR

| | | |
|---|---|---|
| FILE NUMBERS | : | EEOC File # 320-A0-8224X<br>Agency File # LMS-99-003 |
| COMPLAINANT | : | Mary J. Turton |
| COMPLAINANT'S REPRESENTATIVE | : | Charlotte N. Sweeney, Esq.<br>1756 Gilpin Street<br>Denver, CO 80218 |
| AGENCY | : | Minerals Management Service<br>Department of the Interior<br>Lakewood, Colorado |
| AGENCY HEAD | : | Gale A. Norton, Secretary<br>U. S. Department of the Interior |
| AGENCY REPRESENTATIVE | : | Lee Ineichen, Esq.<br>Office of the Solicitor<br>755 Parfet Street, Suite 151<br>Denver, CO 80215 |
| COMPLAINT | : | Hostile work environment sexual and retaliatory harassment |
| ADMINISTRATIVE JUDGE | : | Glenn G. Meyers<br>Equal Employment Opportunity Commission<br>Denver District Office<br>303 East 17th Avenue, #510<br>Denver, Colorado 80203 |
| DATES AND LOCATION OF HEARING | : | January 8, 9, 10, 11, 2002<br>12600 West Colfax, Suite B-300<br>Lakewood, CO |

## I.    INTRODUCTION

On August 26, 1998, Mary Turton (Complainant) contacted the Agency's EEO office, alleging sexual harassment resulting in a hostile work environment.[1]  The Agency provided EEO counseling and completed the counselor's report on February 19, 1999. On February 12, 1999, Complainant filed a formal complaint.  The Agency investigated the complaint and completed its EEO investigative report on about May 10, 2000.  On April 7, 2000, Complainant requested a hearing before the EEOC.  The hearing commenced on January 8, 2002, and lasted four days.[2]

The following witnesses testified at the hearing: Patricia Kann, Richard Rewey, Complainant, Mary Angela Johnson, Robert Herrera, Carla Diane Ford, Donald Gilman, Robert Prael, Mike Miller, Harold Ginzburg, Donna Moorehouse, Scott Cromwell, Paula Neuroth, Charles Sims, Sheila Perry, Herbert Buskirk, and Mary Mitchell.

The following exhibits were admitted into the record at the hearing: Complainant's Exhibits A through F inclusive; Agency's Exhibits 1, 2, and 5 through 8 inclusive. The following exhibits were first offered and then withdrawn: Agency's Exhibits 3 and 4.

The following words or phrases will be abbreviated in this decision, as follows: IF-T, for the investigative file pertaining to Complainant; IF-K, for the investigative file pertaining to Patricia Kann; Tr1, Tr2, Tr3, and Tr4, for each of the four volumes of the hearing transcript; Com. Exh. for Complainant's exhibit; Ag. Exh. for Agency's exhibit; and, p. for page.

## II.    BACKGROUND

The following recitation of background facts shall also be considered findings by the Administrative Judge.  All controverted factual matters have been resolved in this

---

[1]  On July 9, 2001, I ruled that all incidents of alleged harassment going back to November 1995 would be included as part of the hostile work environment harassment claim raised in this EEO complaint.  See, July 9, 2001, Memorandum.  I based my ruling on a finding that the incidents of alleged harassment occurring more than 45 days before Complainant's initiation of EEO counselor contact are timely raised because they are part of the same employment practice.  When "the acts about which an employee complains are part of the same actionable hostile work environment practice [and]. . .any act falls within the statutory time period," the claim is timely.  AMTRAK v. Morgan, 536 U.S. 101, 120 (2002); see, also Boyer v. Cordant Technologies, Inc., 316 F.3d 1137 (CA10 2003)(plaintiff who filed a charge in 1997 could nonetheless recover for a hostile work environment which existed since she began her employment in 1982).  At least one of the incidents alleged by Complainant occurred within 45 days before counselor contact.  See, also, Anisman v. Treasury, EEOC Request No. 05A00283 (2001) ("reasonable suspicion" that discrimination may have occurred no longer should be considered in determining whether a complainant states a timely raised continuing violation claim).

[2]  Patricia Kann, a co-worker of Complainant, also filed an EEO complaint alleging mostly the same claims against the Agency as those asserted by Complainant.  See Kann v. Interior, EEOC File No. 320-A0-8344X, Agency File Nos. LMS-99-004, and LMS-00-011.  Complainant and Kann were represented by the same attorney.  On October 13, 2000, I consolidated their complaints, which were litigated at the same hearing before me. Simultaneously with the issuance of this decision, I have issued the decision in the Kann case.

2

section.[3]

Complainant (sex–female) started working at the Agency in 1984. Tr2, 85. After a brief period of time working at another federal agency, she returned to the Agency in 1991. Id. In November 1995 she transferred to the Agency's Minerals Management Service division (MMS), Royalty In Kind (RIK) section, where she worked as an accountant (GS-510-12). The RIK section was located in a part of Building 85 at the Denver Federal Center, Lakewood, Colorado. Tr2, 86. Complainant's duties consisted of completing the billing on the RIK oil that was sold to small refineries. Tr2, 87. Beginning in November 1995, Charles Sims (sex–male), the supervisory accountant of the RIK (GS-510-13), was Complainant's immediate supervisor.

Patricia Kann (sex–female) began employment with the MMS in 1991. Tr1, 62. She moved to the RIK section as an accountant (GS-510-12) in July 1996. Tr1, 64. At that time, her duties included the reconciliation of contracts. Id. Beginning in July 1996, Sims was her immediate supervisor.

Sims reported to Don Gilman, branch chief (sex–male), who in turn, reported to Vern Ingraham (sex–male), the division chief of the accounting and reports division. IF-K, 480. Lucy Querques-Denett (sex–female), Ingraham's second-level supervisor, was the associate director of MMS at all relevant times.

Beginning in the 1980s, it was Sims' opinion that women should be barefoot and pregnant, and have no place in the workforce. IF-K, 811; Tr2, 258. In 1986, when one of Sims' female co-workers approached him at work to ask for information, Sims told her to "come on over here and sit on my lap and ask me." Tr2, 244. Since 1994, Sims had an increasingly negative attitude towards women. Tr2, 256; IF-K, 811. Since about 1996, Sims routinely referred to Complainant and another female Agency employee as "dumb bitches." Sims used that phrase when conversing with Robert Herrera (sex–male), an acquaintance of Sims who had business dealings with the Agency, including contacts with Complainant. Tr2, 256, 258.

Beginning in early 1996, and until the end of 1997, Sims subjected Complainant to comments connoting sexual functions, sexual activity, and/or human genitalia. Once when Complainant used the word "come" to convey the meaning that her co-worker named Jim was going to arrive at her desk so they could go out to lunch, Sims responded, saying "'Jim's going to come? When is Jim going to come? Mary, are you going to like it if Jim comes?'" Tr2, 97. Another example involved Complainant's duties requiring her to "unzip files," i.e., use a computer program to reduce the size of computer-stored files. Tr2, 97. When Complainant used the word "unzip" in that sense, Sims would ask her, "'What you going to unzip, Mary? What you going to unzip?'" Tr2, 97. When Complainant told Sims she went to a baseball game the night

---

[3] See section IV.B., below, for an analysis leading to the resolution of disputed facts.

before, Sims said, "What kind of a ballgame?'" Tr2, 97.  In addition to the words "come," "unzip," and "ball," Sims would use similarly vulgar double entendre language connoting male and female genitalia when Complainant used the words "hard" and "hole."  Tr2, 98.  The frequency of Sims' behavior involving profane word meanings gradually increased from early 1996 until it became a constant barrage by the end of 1997.  Tr2, 98.

Sometime between early 1996 and late 1997, Sims told Complainant the ways in which he wanted to be touched by a woman: "'You know what I like?  I like a woman to rub me, to caress me, and to give me a back massage. . .I want her to rub me all over.  I want her to spend time making me feel good.  I want a woman who takes care of me.'"  Tr2, 101.  Sims then asked Complainant, "'What do you like?'"  Complainant did not respond, and ran out of the room.  Id.

While Sims was Kann's supervisor, he told her that he had sex with a woman who had suffered female genital mutilation but that he did not enjoy it because "he couldn't ring her bells."  Tr1, 67.  Sims frequently told Kann that he "didn't want a woman unless he could ring her bells."  Tr1, 67-68.  The phrase "ring her bells" connoted Sims' ability to sexually arouse a female sex partner.

On numerous occasions between early 1996 and late 1997, Sims told Complainant that he wanted a wife who was 15 years old because that was "a good age to get them and train them up right[,] to teach them right, to teach them how to be a good wife."  Tr2, 91.  Sims further explained that "you have to get her [your young wife] up in the morning after your wedding no matter what you did the night before and make her cook you breakfast because you've got to train her right."  Tr2, 93.  Those comments by Sims accelerated in frequency from one time every two weeks to once a day, amounting to a total of over 200 separate utterances of his views on the proper "training" of his hypothetical teen bride.  Tr2, 91.

Likewise, he frequently told Kann what kind of woman he wanted.  Tr1, 164.  He told her many times that he wanted to marry a teenage girl.  Tr1, 166.  Often, Sims talked to Kann about "how to raise a perfect wife.  You want to get her when she's young so you can raise her up right."  Tr1, 71.

A couple of times, Sims told Kann that "he had a whorehouse" while serving in the military in Korea.  Tr1, 76.  In addition, he told Kann that Korean prostitutes "would do anything," suggesting that they would participate in exotic, unconventional sex.  Id.

On several occasions between mid-1996 and late 1997 in Kann's presence, Sims referred to females in the Agency's data management division as "bitches," and specifically to Agency employee Lydia Barder as a "bitch."  Tr1, 75.  About once every month or two months, Sims referred to the RIK team as "his harem."  The majority of the employees Sims supervised in the RIK were women.  Tr1, 76.

4

Sometime between mid-1996 to late 1997, Kann got whipped cream on her hands while cutting a pie at work. Sims said to her: "That's OK, I'll lick your fingers for you." Tr1, 78.

On frequent occasions during the same time period, Sims directed Complainant to come to his office in order to teach him operations on his computer. While in his office, Complainant would stand behind him, between his chair and the wall, so that they both faced his computer monitor. On two such occasions, Sims rolled his chair back and leaned into Complainant, brushing against her breasts. Tr2, 105-106.

Sims also visited Complainant in her work cubicle. On such occasions, he would sit slumped down in the chair in her office, his pelvis at the edge of the chair seat, and the genital area of his pants conspicuously and prominently displayed. Tr2, 101.

On a couple of occasions during casual dress days at work, Complainant wore a sweatshirt with images of fish on the front of it. Tr2, 94. At such times, Sims postioned his face within 10 inches of her breasts and said, "'What's that on your shirt? What's that on your shirt?'" Tr2, 94. When Complainant responded "fish," Sims said "'That doesn't look like fish to me.'" Tr2, 94.

Twice, while Kann was in Sims' office, he stared at her breasts. Tr1, 73. On one of those occasions, in the Fall of 1997, Sims stared at Kann's breasts continuously for about one minute without diverting his stare from her breasts. Id.

On one occasion, when Kann had a backache, Sims told her he would "crack her back." Kann explicitly and adamantly rejected his offer. Sims insisted that she submit to his offer, and after Kann told him "no" many times, she finally acquiesced. Tr2, 5. Sims grabbed her from behind in a bear hug and "crack[ed] her back." Tr1, 72.

Once, when Sims learned that Complainant had a headache, he insisted that she give him her hands so he could perform a remedy that would stop the headache. Tr2, 106-107. Complainant said "no" and put her hands behind her back. While they stood face to face, Sims suddenly reached around her body enveloping her with his arms, grabbed her hand, and began to apply pressure to it until it hurt. Tr2, 107, 108. Sims' response to learning that Kann had a headache was the same. Without first asking Kann's permission, he suddenly grabbed both of her hands and pinched the skin between her thumb and fingers. Tr1, 72.

On an unspecified date, Complainant requested leave from work to obtain antibiotics for a sinus infection. Tr2, 107. Complainant casually told Sims that she did not like taking antibiotics too often. Sims responded, saying: "'Oh, I know why you won't - - don't want to take antibiotics. They'll give you a [vaginal] yeast infection.'" Tr2, 107.

On an unspecified Monday morning during the period from early 1996 to late 1997, Sims told Complainant

'Yesterday [Sunday]. . .I was at Cub Foods, and there was this woman in there and she was just dressed like you wouldn't believe. She was dressed to attract men in there. She wanted all the men in that store to want her. And she - - she had on like these tight jeans and little midriff top that it [sic] showed part of her stomach. . .So anyway, I followed her around the store for a while, and then pretty soon at the checkout. . .I got through the check line, and she was at the check line, so I walked up to her, and I said, [quote] If you're here to attract men, I just want you to know it - - it works, that I'm attracted to you. [end quote]'

Tr2, 99-100. Sims then told Complainant that he later saw the same woman in the parking lot of the Cub Foods store. Tr2, 100.

Sometime during the latter part of 1996, Sims, Complainant, and Kann attended sexual harassment training provided by the Agency. Tr2, 110. Immediately after the training, Sims told Complainant that she could disregard what was said at the training, and that it "doesn't mean anything;. . .you can do whatever you want to." Tr2, 110-110. Sims stopped Kann in the hall after the harassment training, and told her the following joke: "What did one lesbian frog say to the other? [Answer:] I guess we do taste like chicken." Tr1, 74.

During the time that Sims supervised Complainant and Kann, there was some off-color joke-telling and discussion of personal matters among the RIK section staff. RIK staff members openly discussed among themselves, their own personal problems. For example, Kann aired with RIK staff details of her difficult divorce. Sims was privy to some of the jokes and discussions involving the staff he supervised. However, much of the personal and private discussion was carried on solely between RIK staff outside of Sims' presence. In 1996, when Sims began engaging in the conduct described above in Complainant's and Kann's presence, the two women consciously avoided him or changed the subject of their conversation if he appeared. In spite of the sometimes off-color content of the conversation engaged in by RIK staff, including Complainant and Kann, each found Sims' behavior throughout the period from November 1995 to December 1997, to be entirely unwelcome, offensive, and inappropriate.

On December 19 and 23, 1997, Complainant and Kann respectively, each met with Gilman and reported that Sims had made sexist comments, and that his behavior was "part of a long standing pattern of behavior" demonstrating that Sims had a "sexist, demeaning outlook towards women in general." In addition, Kann told Gilman about her meeting with Sims during which he "spent the entire meeting 'staring at. . . [her] breasts.'" Ag. Exh. 5, p. 4. Gilman advised Complainant and Kann that he considered their comments to be serious, and that he would look into the situation and follow-up with each of them. Ag. Exh. 5, p. 4-5. Gilman then reported to Ingraham what Complainant and Kann had said during the December 19 and 23, 1997, meetings.

On January 6, 1998, Gilman told Sims about Complainant's and Kann's allegations

6

concerning Sims' sexually offensive, sexually harassing behavior. Sims did not respond to the allegations. Gilman then told Ingraham that Complainant's and Kann's concerns "probably had some degree of validity. . ." Ag. Exh. 5, p. 6. Gilman took no action to investigate Complainant's or Kann's allegations against Sims. Tr3, 97. Before the hearing of this complaint, Gilman had not received any sexual harassment training. Tr3, 105.

On or about January 13, 1998, the Agency reassigned Sims from his position as chief of the RIK section to the non-supervisory position of staff accountant. Sims' office was relocated to another part of Building 85, away from the RIK section. Sims was upset and angry about his reassignment. IF-T, 7. Ingraham was Sims' first level supervisor in his reassigned position. Robert Prael (sex–male) was assigned to fill Sims' position as RIK section chief.

From about January 13, 1998, to May 1998, Complainant and Kann had no unusual contact with Sims. Beginning in May 1998, Sims appeared with increasing frequency in or near the RIK section. In June 1998, unanticipated encounters between Complainant and Sims increased significantly. Complainant and Kann saw Sims in the hallways about 3 to 6 times per day which was abnormally excessive and unusual. IF-K, 463, 802.

Responding to the unanticipated encounters with Sims, Complainant and Kann restricted their own movement in Building 85 to try to avoid or minimize contact with Sims. Those measures did not result in less contact with Sims.

Sims appeared when Complainant went to the restroom.[4] Moreover, when Complainant or Kann encountered Sims in the hallways, he would leer at them. Tr3, 145-146, 176-177; IF-T, 689. On or about June 17, 1998, in spite of Complainant's attempt to avoid contact with him, Sims brushed against Complainant as he passed her in a Building 85 hallway which was sufficiently wide for them to pass each other without any physical contact. Sometime in about July 1998, Sims entered Complainant's cubicle on two separate occasions before she arrived at work. Tr2, 143.

Beginning in the Summer of 1998, and continuously after that, Complainant and Kann reported Sims' stalking and staring behavior to Prael. Tr1, 115-116; Tr2, 209; Tr3, 177. Prael would in turn report the incidents to Gilman or Ingraham. Tr3, 156. In July and August 1998 the offensive contacts with Sims increased. Tr3, 146.

On July 23, 1998, Complainant reported Sims' stalking and staring behavior to Querques-Denett. Tr2, 144-146. Querques-Denett told Complainant that she was

---

[4] At all times pertinent to this complaint, Sims was taking medication that required him to go to the bathroom as frequently as every half hour. Tr4, 189-190; Tr2, 142. Thus, Sims' restroom requirements remained the same throughout the periods covered by this complaint while his encounters with Complainant and Kann increased.

7

going to move Sims to Golden Hill, a building occupied by the Agency, and located about 3 ½ miles from Building 85. Tr2, 147-148; Com. Exh. E. Querques-Denett said Ingraham would take care of the situation. Tr2, 148. The Agency did not move Sims to Golden Hill. Sims' behavior, including offensive hallway encounters and intimidating staring did not stop. Tr2, 150.

Beginning in August 1998 Sims made several telephone calls to Complainant at her home. The calls were characterized by Sims deliberately failing to acknowledge that he was on the line. When Complainant would answer the phone, Sims would remain silent on the line until Complainant out of frustration hung up the telephone if Sims did not hang up first.[5] IF-T, 73. The frequency of the calls ranged from as few as no calls during a two week period to as many as three calls in one week. IF-T, 75. Sims' calls to Complainant continued until she left Denver in April 1999.

On about August 12, 1998, Kann wrote a letter to Querques-Denett expressing concern about her unexpected encounters with Sims 3 to 6 times per day in the workplace. IF-K, 802-803. The letter also advised that, during those encounters, Sims would stare menacingly at her. IF-K, 802. Querques-Denett gave the letter to Ingraham and instructed him to handle the situation. IF-T, 759. Ingraham scheduled a meeting with Complainant and Kann for August 26, 1998.

On August 24, 1998, Complainant was speaking with co-worker Diane Ford (sex–female) in the hallway near the file room. Tr3, 7-8. While they spoke, Sims walked by them four times within 15 minutes. Tr3, 7-8, 10. As he walked by each time, he stared continuously at both women with an angry expression on his face. Tr3, 8-10, 21-24, 29. Sims did not go into the file room or to the men's room, which were the only two rooms down the particular hallway in which he was walking. Tr3, 8.

Shortly before the August 26, 1998, meeting with Complainant and Kann, Herrera[6] told Ingraham about Sims' history of sexist attitudes, anger, and antagonism towards women. IF-K, 811. Herrera also told Ingraham that Sims believed he was being accused of sexual harassment by women in the workplace, and that Complainant was one of those making allegations against him (Sims). Id.

On August 26, 1998, Ingraham met with Complainant, Kann, Gilman, Prael, and other Agency officials. Complainant and Kann told the meeting participants that Sims stalked them in the halls, and glared at them. IF-T, 760. Further, that if Sims encountered Complainant or Kann in a hallway, he would deliberately change his direction so as to pass by them. Id. Complainant told those at the meeting about the June 17, 1998, incident during which Sims intentionally brushed against her in the hallway. Id. In

---

[5] Complainant recognized Sims' voice during one of the harassing calls when he inadvertently said something like "'Oh, dang,'" and then hung up the telephone. IF-T, 75.

[6] See reference to Robert Herrera on page 3, paragraph 4, of this decision.

addition, Complainant told the meeting attendees about the August 24, 1998, incident during which Sims purposefully passed her and a co-worker four times in the hallway while staring at them with a scowl on his face. Id. Kann stated that she had just filed a sexual harassment complaint against Sims. Id. Complainant and/or Kann spoke of Sims' use of the term "bitches" to describe other Agency female employees. Id. Kann requested that Sims be removed from Building 85. Id.

On or about September 23, 1998, Kann was walking down the hall with a co-worker, and Sims approached the two women coming from the opposite direction. He continued to stare menacingly at Kann as he approached her for about 45 seconds to one minute without averting his eyes from her. Tr4, 336.

On September 25, 1998, Ingraham retired from the Agency. On October 26, 1998, Mike Miller (sex–male) filled Ingraham's vacated position. On or about October 28, 1998, Miller was informed of Complainant's and Kann's sexual harassment allegations against Sims. Tr3, 211-212.

From September until December 1998, Sims continued to frequently stalk and stare at Complainant and Kann in the workplace. Tr1, 119; Tr2, 163, 164. About once every two weeks during that period, Complainant and Kann reported to Prael the escalation of Sims' stalking and staring behavior. Tr3, 177, 180-181, 183-184. Every time Prael would hear from Complainant and Kann about Sims' offensive behavior, Prael would report it to either Miller or Gilman. Tr3, 185.

On September 30, 1998, the Agency authorized an independent investigator, Maurice Babby (sex–male), to investigate Complainant's and Kann's harassment allegations against Sims. On October 30, 1998, Babby submitted his report, entitled "Management Inquiry of Alleged Employee Misconduct (Babby Report), to the Agency. IF-T, 443-782. Without interviewing the witnesses (other than Complainant and Kann) to Sims' stalking and staring behavior, Babby concluded that the stalking and staring allegations were unsupported by the evidence. IF-T, 506. Babby recommended that the Agency issue a letter of counseling to Sims in connection with his use of the work "bitch" in the workplace. IF-T, 462. Babby's final recommendation was that the Agency should consider "taking actions which will eliminate the possibility of ANY contact. . ." between Sims on the one hand, and Complainant and Kann on the other. Babby suggested reassignment of either Sims, or Complainant and Kann, to a location outside of Building 85. IF-T, 468.

In a letter dated December 9, 1998, to Querques-Denett, Complainant and Kann advised that Sims' behavior had not changed and that the situation continued to escalate. IF-K, 490; Tr1, 127. They requested that the 6-to-7-person staff of the RIK section be relocated to the Agency's Golden Hill offices. IF-K, 490; Tr1, 128. The RIK staff worked closely together as a team; thus, any separation of RIK team members would cause inconvenience and inefficiency in the operations of the RIK section. On December 17, 1998, Querques-Denett sent Complainant and Kann a letter which in

9

part stated that Miller was going to discuss "the temporary but immediate relocation of your work area to the Golden Hill Office Complex." IF-K, 496. Kann believed that Querques-Denett intended to relocate the entire RIK team to Golden Hill. Tr1, 128-129.

In December 1998, the Agency hired John Nicoletti, a clinical/police psychologist, to perform a workplace violence assessment.[7] Specifically, Nicoletti was directed to ascertain the threat/violence risk potential posed by Sims, as alleged by Complainant and Kann. IF-T, 421. Nicoletti's interviews with Sims, Complainant, and Kann, and his reading of the Babby Report provided the information that formed the basis of his report.

Nicoletti submitted his Workplace Violence Assessment report (Nicoletti Report) to the Agency on about December 28, 1998. IF-T, 420. In the section of his report entitled "Stalking Related Behaviors," Nicoletti stated: "This category seemed to have the most potential indicators of a behavior pattern." IF-T, 423. In spite of Sims' denial that he had engaged in stalking behavior, Nicoletti did have concerns about Sims with respect to stalking, as follows:

> However, there were two statements made by. . .[Sims] which were of a concern because <u>they could be possibly be indicators of stalking behaviors</u>. The concerning comments occurred when. . .[Sims] stated he knew where both females [Complainant and Kann] live and if I (meaning the evaluator) wanted to know where. . . [Complainant] lived I could look in the phone book under. . . [Complainant], - - - and. . .[Sims] gave the first name of. . .[Complainant's] husband.

(Emphasis added.) IF-T, 423. The Nicoletti Report recommendations to the Agency to prevent problems in the future, included the following:

*   *   *

4.  Ms. Kann and. . .[Complainant] should also be encouraged to report any sort of strange occurrence such as property damage, scratches to their vehicles or **hang up phone calls**. [Emphasis added.]

5.  It is important that. . .[the Agency] from this point on realize that there is no such thing as accidental or coincidental encounters between. . .[Sims] and Ms. Kann and/or. . .[Complainant].

*   *   *

. . .[I]f. . .[the Agency] were to follow up with a written stipulation **to Mr. Simms**

---

[7] The Agency hired Nicoletti because Complainant and Kann expressed fear for their safety as a result of Sims' stalking, staring, and other behaviors of his that Complainant and Kann believed demonstrated his propensity for violence.

[sic] [prohibiting Sims' contact with Complainant and Kann], this should eliminate any type of low level problematic behaviors. [Emphasis added.]

IF-T, 424-425. Finally, with regard to Sims' personal opinion and life-experience comments, the Nicoletti Report stated : "[Sims']. . .personal comments regarding women and concubines, his sharing of personal stories about his dating and sexual life in the workplace is inappropriate." IF-T, 424.

On about December 24, 1998, Miller told Complainant and Kann that they were going to be relocated to Golden Hill, and that the move would be temporary. Tr2, 169, 170, 171. In early January 1999, the Agency relocated Complainant and Kann to Golden Hill. The Agency moved Complainant and Kann, rather than Sims, to Golden Hill even though Sims could have carried out his duties satisfactorily had his workplace been relocated to Golden Hill. Tr3, 116.

In a memorandum dated January 7, 1999, to Complainant and Kann, Miller directed them to "have NO interaction or contact with Mr. Sims," even though Nicoletti recommended that Sims, and not Complainant or Kann, receive such a no-contact directive. IF-T, 437; Tr4, 25. Sims also received the January 7, 1999, memorandum which included a provision prohibiting his contact with Complainant or Kann. IF-T, 439-440.

In January 1999, Sims began calling Kann at home by telephone and remaining on the line in silence, thus employing the same modus operandi used with his calls to Complainant. Tr1, 135-136. The calls to Kann continued at the rate of several each week until Fall 1999, when she obtained an unlisted number. Tr1, 136; Tr2, 66.

Complainant's and Kann's workplace remained at the Golden Hill building. In April 1999, Complainant transferred from Denver to a position with the Agency in New Orleans, Louisiana.

## III.    ISSUE

Whether the Agency subjected Complainant to hostile work environment harassment based upon her sex (female), and her protected EEO activity (retaliation).

## IV.    ANALYSIS AND FINDINGS--PRELIMINARY EVIDENTIARY MATTERS

All the facts and findings I have set forth in the background section above are incorporated into this section as if set forth herein verbatim.

11

## A. The Sexual and Nefarious Quality of Sims' Less Transparent Behavior[8]

There are several instances where Sims' behavior was clearly sexual and nefarious. For example, Sims' uninterrupted staring at Kann's breasts, and his reference to a Korean whorehouse and prostitutes, constituted conduct that was clearly sexual in nature. Likewise, it was with clear malicious and sexist intent that Sims referred to female Agency employees as "bitches."

In contrast , there is other conduct of Sims that is less transparently sexual or offensive. For example, Sims' use of words like "come," "hard," "ball," and "unzip," examined out of context, could convey either an innocent non-sexual meaning, or a profane sexual meaning. Likewise, some of Sims' non-verbal conduct–bending down and placing his face near Complainant's breasts under the guise of looking at the images on her sweatshirt, and the supposed casual brushing against Complainant's breasts–constituted behavior that was susceptible of either innocent or nefarious interpretation.

It is Complainant's burden to establish by a preponderance of the evidence that Sims intended his behavior to convey profane sexual or nefarious meaning. See, *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). After examining Sims' less transparent behavior in the context of the entire evidentiary record, I determined that by preponderant evidence, all of Sims' suggestive behavior was carried out with the intent to convey profane sexual meaning and for malicious purposes. Several items of evidence support my conclusion, as follows: 1) Sims' relentless use of double entendre language that connoted sexual as well as non-sexual meaning; 2) Sims' frequent references to blatant and overtly sexual topics (for example, the Korean whorehouse, or his having had sex with a genitally-mutilated woman); and 3) Sims' plainly negative, sexist attitudes toward women in general.

Therefore, I conclude that Sims repeatedly used words with non-sexual and non-nefarious meanings in order to make vulgar sexual references, as follows: Sims said "come" to suggest ejaculate, "ball" to suggest testicle, "unzip" to suggest the unzipping of clothing before disrobing, "hard" to suggest an erect penis, and "hole" to suggest a vagina. Likewise, by preponderant evidence, I find Sims' non-verbal, less transparently sexual conduct (e.g., his suggestive posture while sitting, and his brushing against Complainant's breasts) was also intentionally sex-related and malicious.

## B. Controverted Incidents of Harassment

In this section of the decision, I provide my reasoning substantiating the findings I made in section I. Background, regarding factual issues that were controverted by the parties.

---

[8] My inquiry here is separate and distinct from the related question of whether Complainant has established element (3) of the prima facie case of sexual harassment, i.e., whether Sims' behavior was motivated by Complainant's gender. Element (3) of the prima facie case of harassment is discussed below in section V.A. of this decision.

In resolving the controverted facts, Complainant had the burden of proving by a preponderance of the evidence that her version of events was more likely to have occurred than the Agency's contradictory account of events. See, Burdine, cited above. As the court said in Henson v. City of Dundee, 682 F.2d 897, 912 n. 25 (CA11 1982): "In a case of alleged sexual harassment which involves close questions of credibility. . ., the existence of corroborative evidence or the lack thereof is likely to be crucial." In each instance where the factual assertions of Complainant and the Agency were in conflict, I found that Complainant successfully met her burden of proof, and I made a finding supporting Complainant's version of factual events.

In several instances, I resolved factual disputes in Complainant's favor because Complainant's version was corroborated by co-complainant Kann's account of the same type of incident. Often, Sims' denial was the only evidence that contradicted Complainant's and Kann's coinciding versions of a particular event. This was the case regarding issues such as Sims' grabbing of Complainant's and Kann's bodies supposedly to administer a remedy for head or back aches, and Sims' placing of harassing phone calls to Complainant and Kann.

Likewise, the corroborative testimony of apparently unbiased witnesses was persuasive in determining that Complainant had met her burden of proof on various disputed factual issues. Such was the case regarding Sims' anger about his removal as chief of the RIK section. The testimony of Complainant's male co-worker on that issue deserved considerable weight because he appeared to lack motives to demonstrate partiality toward either Sims or Complainant and Kann.[9] Similarly, Herrera's testimony regarding Sims' negative attitudes and sexist beliefs about women was more persuasive than Sims' denials, which I determined to be motivated by Sims' obvious self-interest.

Other disinterested witnesses (co-workers of Complainant and Kann), corroborated Complainant's testimony relating to Sims' stalking and staring behavior. That apparently unbiased witness testimony supported my finding that, more likely than not, Sims repeatedly stalked and stared at Complainant and Kann in the workplace. My finding on the stalking/staring issue was further bolstered by Nicoletti who concluded that Sims was capable of engaging in stalking behavior. Finally, Sims' own account of his following an attractive, revealingly dressed women in a grocery store, lent further weight to the finding that Sims engaged in stalking and staring behavior.

Despite Sims' denial, my finding that Sims stared at Kann's breasts was supported by a preponderance of the evidence. His similar behavior, which I have found was engaged in with sexual and nefarious intent—bending at the waist to look intently at the fish images on the front of Complainant's sweatshirt, and brushing against Complainant's

---

[9] The male co-worker was Herbert Buskirk (sex–male), an accountant in the RIK section, and an acquaintance of Complainant and Kann.

13

breasts under the guise of casual, unintentional physical contact--supports my finding of fact on this issue.

In addition to Kann's corroboration on the issue of the harassing telephone calls, Complainant proffered additional evidence which supported my finding that Sims did place harassing phone calls to Complainant. Particularly persuasive was Complainant's own testimony that identified Sims' voice during one of the harassing phone calls. In addition, Nicoletti's suggestion that Sims might revert to "hang-up" phone calls further supported my finding.

Finally, I find Complainant established that Gilman and Ingraham were both aware of allegations about Sims' stalking and staring behavior in June 1998, well before the August 26, 1998, meeting. Prael's testimony was persuasive on that issue because Prael was not in Sims' chain of command. In contrast, Gilman and Ingraham, both supervisors of Sims at various times, had an interest in denying early awareness of complaints about Sims' behavior.

## V.    ANALYSIS AND FINDINGS--LIABILITY

### A. Hostile Environment Sexual Harassment

Complainant brings this complaint under Title VII of the Civil Rights Act of 1964 (Title VII), as amended, 42 U.S.C. §2000e-1, *et seq.* Title VII provides that employees such as Complainant "shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. §2000e-16(a). Complainant's theory of liability is that the Agency subjected her to hostile work environment harassment based upon her gender (female).

To establish a case of hostile work environment sexual harassment, Complainant must demonstrate that:

(1)    she is a member of a protected class;

(2)    she was subjected to unwelcome sexual harassment;

(3)    the harassment complained of was based upon sex; and,

(4)    the harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment.

*Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); and, *Trammel v. USPS*, 01871154 (1988).

14

Element (1) above is met: Complainant is female.

Element (2) requires that Complainant was exposed to unwelcome conduct. Conduct is regarded as unwelcome if the employee did not solicit it or incite it and the employee regarded it as undesirable or offensive. *Henson*, 682 F.2d at 903. Complainant established by preponderant evidence that the harassing incidents fall into the category of unwelcome conduct. I reject the Agency's argument that the workplace was permeated by off-color, licentious, and lewd conduct and language on the part of Complainant and Kann as well as Sims. The evidence supports a finding that Sims' conduct went well beyond the off-color jokes and discussion that occurred primarily among and between the RIK staff supervised by Sims but not in his presence. In addition, there were none of the gestures, touching, and explicit sexist subject matter among the RIK non-supervisory staff that approximated that to which Sims subjected Complainant.

To establish Element (3), Complainant must show that the motivating factor in the harassment was her gender (female). The harassing conduct, initiated by Sims, was clearly motivated by the gender of the victim. It included such behavior as repeated references to women that characterized them in a degrading, inferior manner. It furthermore included offensive intentional touching and staring at Complainant's breasts, the uninvited and objected-to embracing of Complainant's body under the ruse of administering a treatment for her headache, and the intentional brushing against her body in a hallway. After Sims' removal as Complainant's supervisor, the harassment took the form of multiple incidents of stalking and staring at her in the halls of the workplace, and of placing numerous menacing telephone calls to her home. The stalking/staring behaviors were a manifestation of Sims' intent to exercise power as a male over a female. I find that the conduct alleged was motivated by Complainant's female gender.

To establish element (4), Complainant must show that the unwelcome conduct was "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor*, 106 S.Ct.at 2406 (quoting *Henson v. City of Dundee*, 682 F.2d at 904.)

Since "hostile environment" harassment takes a variety of forms, many factors affect this determination, including: (a) whether the conduct was verbal or physical, or both; (b) how frequently it was repeated; (c) whether the conduct was hostile and patently offensive; (d) whether the alleged harasser was a co-worker or a supervisor. In determining whether unwelcome sexual conduct rises to the level of a "hostile environment" in violation of Title VII, the central inquiry is whether the conduct "unreasonably interfer[es] with an individual's work performance" or creates an "intimidating, hostile, or offensive working environment." 29 C.F.R. §1604.11(a)(3). See, also, EEOC Policy Guidance on Sexual Harassment, No. 915.002 (March 19, 1990), pages 14-19.

15

In finding that Complainant met her burden of proof with respect to element (4), I considered the totality of circumstances to which she was subjected rather than any single incident. The offensive conduct was both verbal and non-verbal, and also included physical contact. From late 1995 until December 1997, Sims' conduct was primarily verbal, consisting of Sims' relentless sexist, degrading, and demeaning comments about women in general and about Complainant in particular in the workplace. Counting all incidents of offensive verbal and non-verbal conduct directed by Sims against Complainant, I find that there were a total of over 200 separate incidents of objectionable harassing behavior. In addition, on several occasions Sims offensively made physical contact with Complainant, including brushing against her breasts, and entrapping her body.

Beginning in January 1998, Sims' removal as Complainant's supervisor limited his access to her. Beginning in May 1998, he consequently changed his harassing tactics. From May 1998 until January 1999, Sims stalked and stared at Complainant in the workplace. Harassing looks, combined with the perpetrator's presence in a complainant's work area, can form the basis of a hostile work environment claim. *Yonkers v. Secretary of Transportation*, EEOC Appeal No. 01964675 (1998). *See also Finn-Verburg v. New York State*, 165 F.Supp.2d 223, 228 (N.D.N.Y. 2001) (concluding that plaintiff established hostile work environment where she was subjected to a pattern of stalking and "angry, intense glaring"). Other courts have also utilized stalking and staring conduct to support a finding of a hostile work environment. *See, e.g., Cross v. Alabama Dept. of Mental Health*, 49 F.3d 1490, 1495 (CA11 1995) (citing "glaring looks" and "piercing looks"); *Stoll v. Runyon*, 165 F.3d 1238, 1239 (CA9 1999) (relying on "stalking" the plaintiff throughout the postal facility); *Hathaway v. Runyon*, 132 F.3d 1214, 1217 (CA8 1997) (citing glaring "with a menacing look"); *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 198 (CA5 1992) (noting supervisor followed employee to the restroom and waited in the hall until she returned). While repeatedly stalking Complainant, Sims stared at her with glaring, angry, and hostile facial expressions.

In addition, from August 1998 to April 1999, Sims made numerous menacing telephone calls to Complainant at her home for the purpose of harassing her.

All of Sims' harassment of Complainant, including verbal and non-verbal, physical and non-physical behavior, lasted three years and four months (from December 1995 until April 1999), excluding a four month period between January and May 1998. In other words, Complainant was the victim of Sims' harassment for a total of three years.

Sims' conduct, considered in its entirety, was severe and pervasive, and created an exceedingly abusive, offensive, and hostile working environment in which Complainant worked. I find that Complainant established a prima facie case of hostile environment sexual harassment.

16

## B. Harassment Based Upon Retaliation

In addition to the anti-discrimination provisions of Title VII, Complainant also alleged violations of the Title VII's anti-retaliation provisions. 42 U.S.C. §2000e-3. Complainant's claim of retaliation overlaps with her hostile environment sexual harassment claim. From May 1998 until January 1999, Sims stalked and stared at Complainant, and from August 1998 until April 1999, he made harassing telephone calls to her home, in retaliation for her complaint in December 1997 that led to Sims' removal as supervisor. In order to prove actionable retaliation, whether it is a single claim or is part of a harassment claim, Complainant must show, for each incident of alleged retaliation, the following:[10]

(1)     Complainant engaged in opposition to Title VII discrimination or participated in a Title VII proceeding;

(2)     The Agency employee responsible for the adverse action knew or should have known of the protected activity;

(3)     Complainant suffered some adverse action by the Agency subsequent to or contemporaneously with Complainant's protected EEO activity;

(4)     A causal connection exists or can be inferred between Complainant's protected EEO activity and the Agency's adverse action against Complainant.

*Love v. REMAX of America, Inc.*, 738 F.2d 383 (CA10 1984); *Holmes v. Postal Service*, EEOC No. 01842593 (1986).

Element (1) is established. Title VII prohibits retaliation for an employee's protected EEO activity which consists of <u>opposing a practice made unlawful</u> by one of the employment discrimination statutes. See, EEOC Directives Transmittal, No. 915.003

---

[10] Normally, harassment consists of multiple incidents, no single one of which is sufficiently severe to create a hostile work environment. Hence, the incidents need to be considered cumulatively to determine if they meet the severe or pervasive requirement of actionable harassment. In contrast, a single incident of retaliation on its own may be sufficient to constitute an actionable claim of retaliation because the threshold is low for establishing retaliation. See, EEOC Directives Transmittal, No. 915.003 (May 20, 1998), pp. 8-13 to 8-14 ("any adverse treatment that is based on a retaliatory motive. . .[excluding] petty slights and trivial annoyances [is actionable]"). Therefore, I need not consider the incidents of retaliation in their totality to determine if a harassment claim exists. Each proven incident of retaliation constitutes a separate claim of retaliation, i.e., a separate violation of Title VII.

Moreover, each violation based upon retaliation also constitutes a proven claim of retaliatory harassment. This is so because harassment, unlike other Title VII claims, does not require application of the *McDonnell Douglas* three-part analysis, including 1) prima facie case, 2) articulated legitimate non-discriminatory, non-retaliatory reasons for employment action, and 3) pretext. See, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Because harassment by its nature is not regarded as any kind of legitimate employment action, it is established upon demonstration of the elements set forth above in section V.A. of this decision. The only way for an agency to avoid liability in a harassment case is to prove one of the defenses specified below in section V.C. of this decision.

17

(May 20, 1998), pp. 8-3 to 8-4. "This protection applies if an individual explicitly or implicitly communicates to his or her employer. . .a belief that its activity constitutes a form of employment discrimination that is covered by any of the statutes enforced by the EEOC." Id. at p. 8-3. In December 1997, Complainant complained to Gilman that Sims had engaged in conduct demeaning toward women, including sexist comments. Complainant's statements to Gilman, thereafter relayed to Ingraham, constituted a complaint of sex-based discrimination against the Agency. Therefore, Complainant engaged in protected EEO activity in December 1997.

Complainant established element (2). Each incident of stalking, staring, touching, and harassing phone calls, occurring between May 1998 and April 1999 constituted a separate retaliatory adverse action. Complainant's January 1999 relocation to the Golden Hill building was another adverse action because she was then isolated from the RIK section. Furthermore, in January 1998, Gilman advised Sims of Complainant's opposition to Sims' sexist harassing behavior. By January 1998, Gilman, Ingraham, and Sims were aware of Complainant's protected EEO activity.

Complainant demonstrated element (3) because Sims's retaliatory behavior began in May 1998, not more than 4 months after Sims became aware of Complainant's protected EEO activity. The adverse harassing actions—stalking, staring, offensive touching, and menacing phone calls—occurred subsequent to Complainant's protected EEO activity. Complainant also demonstrated by preponderant evidence—contrary to Agency-proffered evidence—that Sims was angry about losing his supervisory position as RIK chief, and about being reassigned to a non-supervisory accountant position. Sims' resentment and anger motivated his retaliatory animus directed at Complainant and Kann. Furthermore, Complainant's relocation to Golden Hill in January 1999 constituted a retaliatory response to Complainant's and Kann's protected EEO activity.

Element (4) is met because the causal connection is established between Complainant's protected activity and the adverse retaliatory actions. Only four months elapsed between Complainant's EEO activity (in January 1998) and the beginning of Sims' stalking and staring behavior (in May 1998), as well as Agency management's inaction in the face of credible information indicating that Sims was harassing Complainant.

Complainant established prima facie cases of retaliatory harassment for each and every instance of stalking, staring, menacing telephone calls, and touching that occurred from May 1998 through April 1999, as well as Complainant's transfer to Golden Hill in January 1999.

## C. Vicarious Liability of the Agency for Sims' Actions

From early 1996 until December 1997—approximately two years—Sims sexually harassed Complainant in his role as her supervisor. From May 1998 until April 1999, Sims harassed Complainant as her co-worker.

18

### 1. Harassment from early 1996 to December 1997

In *Burlington Industries, Inc. v. Ellerth*, 118 S.Ct. 2257 (1998) and *Faragher v. City of Boca Raton*, 118 S.Ct. 2275 (1998), the Supreme Court ruled that employers are subject to vicarious liability for the unlawful harassment of employees by supervisors. The employer is liable even when it was <u>unaware</u> of the supervisor's harassment, <u>unless</u> the employer can establish the affirmative defense specified in *Faragher*. In a case of hostile work environment sexual harassment, the employer may avoid liability by establishing both of the following elements:

(1)     the employer exercised reasonable care to prevent and correct promptly any harassing behavior, and

(2)     the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Faragher*, at 2293. The evidence demonstrates that the Agency had no sexual harassment prevention policy from early 1996 through April 1999, the period Complainant was victimized by Sims' harassment.[11] During the latter part of 1996, the Agency did provide its employees with sexual harassment training. The Agency, however, failed to present any evidence demonstrating the content of the training, including the steps available to an employee to prevent or correct a situation where s/he was experiencing harassment. Moreover, the Agency performed an utterly deficient, cursory, inadequate, and untimely investigation of the complaints brought to its attention by Complainant. Finally, the Agency took no effective corrective action to remedy the ongoing harassment perpetrated by Sims. The Agency failed to establish element (1) of the affirmative defense.

In the absence of a policy to prevent or correct sexual harassment, there were no mitigating measures available to Complainant, i.e., there was no internal reporting process at the Agency to prevent harassment. Accordingly, the Agency failed to establish element (2) of the *Faragher* defense to vicarious liability.

In conclusion, the Agency has failed to meet both elements of the affirmative defense set forth in *Faragher*, and therefore the Agency failed to avoid vicarious liability or to mitigate Complainant's damages in this case.

---

[11] An Agency's written policy on sexual harassment must contain several elements. See, EEOC Enforcement Guildance, No. 915.002 (June 18, 1999), pages 15-25. The Agency's written policy is lacking if it does not: 1) Assure that employees who make complaints will be protected against harassment; 2) Have a clearly described complaint process that provides accessible avenues of complaint; 3) Assure that the employer will protect the confidentiality of harassment complaints; and 4) Assure that the employer will take immediate and appropriate corrective action when it determines that harassment has occurred. Here the Agency had no policy for the prevention or correction of sexual harassment.

## 2. Harassment from May 1998 through April 1999

An employer with knowledge of a coworker's inappropriate behavior is held to a negligence standard with regard to the steps it must take to stop the objectionable behavior. *Carr v. Allison Gas Turbine Div. Gen. Motors Corp.*, 32 F.3d 1007 (CA7 1994). An employer is liable when it "knew, or upon reasonably diligent inquiry should have known," of the harassment. *Yates v. Avco Corp.*, 819 F.2d 630, 636 (CA6 1987). "[A]n employer who has reason to know that one of his employees is being harassed in the workplace by others on grounds of. . .sex,. . .and does nothing about it, is blameworthy." *Hunter v. Allis-Chalmers Corp.*, 797 F.2d 1417, 1422 (CA7 1986).

In December 1997, Gilman and Ingraham were aware of allegations about Sims' harassing conduct directed at Complainant. Beginning in January 1998, Sims was removed as Complainant's supervisor, and became her coworker. By June 1998, Agency management had credible information about Sims' stalking and staring behavior directed at Complainant.

The actions taken by Agency management were utterly inadequate and ineffective in remedying the harassment. First, the Agency delayed from June 1998 until August 26, 1998 before it even held a meeting to hear the allegations of Complainant. Agency managers' belief that the allegations of stalking were not specific enough to warrant action constituted a gross failure on management's part to recognize a serious problem in the workplace. The evidence of record lacks references to the Agency making any substantial or probing inquiry of Sims about the allegations of stalking. Not until October 1998 did the Agency engage Babby to investigate the harassment allegations. Babby's investigation was inadequate, in part, because he did not even contact disinterested witnesses to incidents of stalking. Querques-Denett stated that Sims would be removed from Building 85, and moved to the Golden Hill site, but she never relocated Sims. Although the Nicoletti Report provided the Agency alarming information about the potential threat Sims posed to Complainant's safety, it did nothing. In every respect, Agency management's response to the problem was wholly inadequate, demonstrating a complete failure to take proper remedial action.

Furthermore, the Agency's decision to move Complainant rather than Sims to Golden Hill constituted an unreasonable and ineffective remedial action. "The Commission has ruled that the victim of harassment should not be required to take an involuntary transfer or reassignment, but rather, the individual found to have committed the prohibited harassment must bear any derogatory effects of providing the victim with full relief." *Phillips v. U. S. Postal Service*, EEOC Appeal No. 01985285 (2001). See, also, *Monroe v. Dept. of the Navy*, EEOC Request No. 05910382 (1991). The Commission has upheld the reassignment of a harassment complainant only where the complainant requested the reassignment. *Hodge v. Dept. of Transportation*, EEOC Petition No. 04910007 (1992). Unless the transfer of the harassment victim is voluntary, it cannot constitute effective remedial action. *Taylor v. Dept. of the Air Force*, EEOC Request

No. 05920194 (1992). On more than one occasion, Complainant or Kann requested that Sims be moved out of Building 85, or that the RIK section be moved in its entirety to Golden Hill. Neither of those requests was implemented by Agency management. Complainant's relocation to Golden Hill left her worse off because of her isolation from the RIK section and other members of the Agency work force. Id.

In conclusion, the Agency's response to the stalking and staring allegations was totally inadequate and ineffective. Sims' behavior continued unabated. The Agency instead took the action of removing the victim from the hostile, offensive work place, thus punishing Complainant for the actions of the harasser.

## VI.    ANALYSIS AND FINDINGS–COMPENSATORY DAMAGES, AND ATTORNEYS FEES

### A. Compensatory Damages

Complainant is entitled to compensation for "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." Civil Rights Act of 1991, 42 U.S.C. §1981a(a) and (b); EEOC Enforcement Guidance, No. N-915.002 (July 14, 1992), p. 10. An award for emotional harm is warranted only if there is a sufficient causal connection between the agency's unlawful actions and the complainant's injury. See, EEOC Enforcement Guidance, p. 11; Gore v. Turner, 563 F.2d 159, 164 (CA5 1977). An award of compensatory damages for such losses should reflect the extent to which the agency directly or proximately caused the harm, the nature and severity of the harm, and the duration or expected duration of the harm. See, Lawrence v. USPS, EEOC Appeal No. 01952288 (1996).

Complainant must produce objective evidence of nonpecuniary damages. Complainant's evidence of non-pecuniary losses–including emotional harm, suffering, loss of enjoyment of life, and mental anguish–consists of her own testimony, and the testimony of her evaluating psychiatrist. Complainant successfully sustained her burden of proving nonpecuniary compensatory damages.

In 1995, prior to working for Sims, Complainant was in good health, happy, optimistic and enthusiastic about the future. Tr2, 175. Complainant's life was well organized, she liked to travel, she enjoyed spending time with her son and essentially had established herself in a life pattern that was fully acceptable. Tr3, 261.

During the time she was victimized by Sims, Complainant experienced a twenty pound weight gain. Tr2, 176. She also experienced a significant loss of self-esteem. Id. In 1996, she started having menstruation problems, but would not go to the doctor because she did not want to talk to Sims about sick leave. Id. Complainant experienced episodes of vertigo with extreme dizziness. Id. She also had significant stomach problems which resulted in vomiting and diarrhea. Tr2, 176, 177.

21

Beginning in early 1996, and until April 1999, Complainant experienced feelings of helplessness and being out of control. She was frequently depressed, manifested by sadness and frequent crying. Tr, 179. Complainant has become very afraid to interact with people, particularly older men. Id. Currently, she will not ride in an elevator alone with an older white male. Id. She no longer socializes with anyone. Tr, 180.

While supervised by Sims, Complainant started having problems with her feet, and by October 1997 she suffered from severe swelling in her feet. Tr2, 176, 218. In February 1998 (after Sims' removal as supervisor), Complainant sought medical treatment for her foot problems. Tr2, 218. She was treated by a neurologist regarding her feet because it was adversely affecting her sleep. Extensive tests were administered in 1998 but no physiological explanation for her impairment was ever identified. Tr2, 177, 178. The neurologists who treated Complainant concluded that stress was the cause of the foot and related conditions. Tr2, 218, 219. Her doctor then prescribed her mild anti-depressants. Tr2, 178.

Following her experiences with Sims, Complainant became more emotionally volatile accompanied by frequent bouts of crying. Tr3, 261. She engaged in significant social withdrawal, and experienced sleep disturbance and fear. Tr3, 264. Following her victimization by Sims, she feels as if she has aged at an abnormal and accelerated rate. She is depressed and constantly sad. Id.

She had none of the above physical symptoms prior to her experiences with Sims. Tr2, 178. Some, but not all, of these physical problems have subsided since her move to New Orleans. Id. During the time period that she worked for Sims, and until she moved in April 1999, it was necessary for her to take three hundred (300) hours of sick and annual leave as a result of Sims' harassment. Tr2, 180, 181.

The Agency proffered evidence to support its claim that Complainant moved to New Orleans because she wanted to live there and not because she wanted to move away from Sims. The record shows that Complainant frequently talked about New Orleans, and how much she loved it. Tr4, 281. She preferred the warmer climates of the South, and did not like Denver weather. Tr4, 307.

The evidence supporting the Agency's position is controverted by more persuasive evidence presented by Complainant which demonstrates that she moved to New Orleans because of Sims' harassment and Agency management's lack of support for her. The move to New Orleans forced Complainant to move away from her only child and grandchild. Tr2, 180. At the time of Complainant's move to New Orleans in April 1999, she did not know anyone in New Orleans. She had recently remodeled her house in Denver. She wanted to retire in the South, in either Mobile, Alabama or in Florida. By preponderant evidence, I find that Complainant transferred to the MMS division in New Orleans to get away from Sims and an unsupportive environment fostered by MMS management in Denver. In New Orleans, Complainant has an unlisted phone number, and has made herself invisible in the community. Tr3, 262.

22

In February 2001, Dr. Harold M. Ginzburg, M.D., a psychiatrist, evaluated Complainant to determine the presence of any psychiatric dysfunction that may be present and attributable to a series of work-related incidents. Dr. Ginzburg is a physician, board certified in psychiatry. Tr3, 252. Based on Dr. Ginzburg's curriculum vitae (Com. Exh. D), the Agency stipulated that Dr. Ginzburg is an expert in psychiatry. Tr3, 254. Dr. Ginzburg has provided forensic evaluations on behalf of both plaintiffs and defendants with an approximate split of 50/50. Tr3, 255.

Dr. Ginzburg diagnosed Complainant with an adjustment disorder with depressive features. Tr3, 262. Dr. Ginzburg determined that the causes of Complainant's condition were her interactions with Sims and the Agency's lack of effective response to the same. Tr3, 265, 266. In the course of his evaluation of Complainant, Dr. Ginzburg concluded that there were absolutely no signs that Complainant was malingering. Tr3, 267-268. Further, Dr. Ginzburg concluded that Complainant genuinely appeared to be affected by what she was sharing with him. Tr3, 268. Dr. Ginzburg prescribed an anti-depressant for Complainant and recommended that she engage in follow-up treatment with a provider. Tr3, 270. The medication was designed to relieve the symptoms that Complainant was experiencing and make her more comfortable. It does not provide a cure, but merely relief so that she can work through the issues. Tr3, 277.

As of February 2001, Dr. Ginzburg reported that Complainant continued to be afraid of Sims. She did not sleep well and had nightmares on a nearly nightly basis. Com. Exh. C, p.12. Additionally, Complainant did not have a social life, she worked in the yard, sewed and did "house things," but did not want to have any friends. Complainant reported: "I don't have problems meeting people but I want to barricade myself." Com.Exh.C., p.6.

In summary, Complainant suffered from the following conditions and impairments: weight gain; loss of self-esteem; vertigo with dizziness; stomach problems including vomiting and diarrhea; feelings of helplessness and being out of control; depression manifested by feelings of sadness and frequent crying; fear of contact with people, particularly older men; social withdrawal; severe swelling in feet; feelings of being aged; adjustment disorder with depressive features; sleeplessness; and, nightmares. These conditions, or most of them, persisted from early 1996 until at least February 2001, a period of over 5 years.

I find that, given the nature and extent of the Agency's conduct, Complainant's mental distress and pain was a direct result of the Agency's illegal conduct. See, in this regard, Lawrence, at 5, above, citing U. S. v. Balistrieri, 981 F.2d 916, 932 (CA7 1992), with approval.

Damages for emotional harm vary significantly and there are no definitive rules or formulas for computing the amounts to be awarded. However, compensatory damage awards must be limited to the "sums necessary to compensate the. . .[complainant] for actual harm, even if the harm is intangible, and should take into account the severity of

23

the harm and the length of time the injured party has suffered from the harm." See, *Carpenter v. Department of Agriculture*, EEOC Appeal No. 01945652 (1995). A proper award must meet two goals: it must not be "monstrously excessive," and it must be consistent with awards made in similar cases. See, *Cyqnar v. City of Chicago*, 865 F.2d 827, 848 (CA7 1989), and *Lawrence*, at page 6, above.

Examples of cases having similarities to Complainant's include: *Peyton v. DiMario*, 287 F.3d 1121 (CADC 2002)(affirmed district court's award of $300,000 compensatory damages due to distress and depression, reduced from jury award of $482,000, in case where female federal employee suffered sexual harassment and retaliation in violation of Title VII); *Velez v. Roche*, 335 F.Supp.2d 1022 (ND Cal. 2004)(jury award of compensatory damages of over $500,000 against U. S. Air Force reduced to statutory cap of $300,000, in case of gender discrimination where sexually offensive comments were frequent and constant, resulting in agency causing and failing to stop hostile work environment in which female physician worked); *Pollard v. E. I. Dupont De Nemours, Inc.*, 16 F.Supp.2d 913 (W.D.Tenn. 1998)(award of $300,000 in compensatory damages for psychological damage, pain, and humiliation suffered in hostile work environment sexual harassment case brought by female employee); *Baker v. John Morrell & Co.*, 249 F.Supp.2d 1138 (N.D.Iowa 2003)(jury's award of $750,000, remitted to $300,000, in Title VII action for harassment based upon female gender, and retaliation); *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493 (CA9 2000)(affirming $1 million emotional distress award for sexual harassment where female plaintiff "worried, cried, and felt trapped and upset," spent less time with her family, suffered stomach problems, rashes and headaches, and sought counseling with her pastor); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322 (CA11 1999) (jury awarded plaintiff $450,000 in emotional pain and suffering damages); *Hudson v. U. S. Department of Justice*, 130 F.3d 1193 (CA6 1997) (complainant brought suit against agency for sex discrimination and retaliation in violation of Title VII; jury found the agency liable for sex discrimination and retaliation, and awarded complainant $250,000 in compensatory damages for sex discrimination, and $500,000 in compensatory damages for retaliation); *Lucas v. J. C. Penney Co.*, No. C93-1840C (W.D.Wash. Jan. 17, 1996), cited in *Demary v. U.S.A.*, 982 F.Supp. 1101 (D.S. Car. 1997) (jury award of $1.5 million in hostile environment employment discrimination case where 56 year old plaintiff was forced into early retirement by management's inappropriate response to coworker's continuing use of racial slurs and threats of violence--although award is apparently largely attributable to emotional distress injuries, it includes some unsegregated economic losses).

Based on the foregoing, I find that an award of $380,000.00 in compensatory damages for Complainant's proven nonpecuniary loss is reasonable and consistent with the amounts awarded in similar cases.

The Civil Rights Act of 1991, 42 U.S.C. §1981a(b)(3), limits the total amount of compensatory damages that may be awarded to each complaining party according to

24

the number of persons employed by the Agency. The limit for an employer with more than 500 employees, such as the Agency, is $300,000. 42 U.S.C. §1981a(a)(3)(D). In jury trials, the court is prohibited from informing the jury of compensatory damages limitations such as the $300,000 limit in this case. 42 U.S.C. §1981a (c)(2). In enacting this section, it is reasonable to infer that Congress did not intend the compensatory damages cap to be "the universe" of possible damages but rather a liability cap, regardless of the amount of the damages actually suffered by a complainant. Therefore, the sum of Complainant's recovery for non-pecuniary compensatory damages, valued at $380,000.00, is reduced so that it does not exceed the statutory cap of $300,000.

## B. Attorney Fees and Costs

By federal regulation, an agency must award attorney fees, in accordance with existing case law and regulatory standards, for the successful processing of an EEO complaint. 29 C.F.R. §1614.501(e). The fee award is normally determined by multiplying the number of hours reasonably expended on the case by a reasonable hourly rate. *Blum v. Stenson*, 465 U.S. 886 (1984); 29 C.F.R. §1614.501(e)(2)(ii)(B).

A fee petition must "contain sufficiently detailed information regarding the hours logged and the work performed" to permit the determination of the correct award. *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1327 (CADC 1982). "Casual after-the-fact estimates of time expended on a case are insufficient to support an award of attorney's fees." *Id.*

Complainant's representative submitted a proper and timely verified statement of fees and costs with an accompanying affidavit itemizing the charges for legal services. 29 C.F.R. §1614.501(e)(2)(i). The amounts claimed are attributable to the services rendered and costs incurred with respect to the consolidated discrimination complaints of Complainant and her co-Complainant, Patricia Kann.[12] Complainant succeeded in meeting her burdens of proof in this matter, in part, because of the corroborative effect of evidence presented in support of Kann's complaint. Thus, fees and costs incurred in support of Kann's discrimination claims constituted a reasonable expenditure of time in the effort to prove Complainant's case. The total amount of attorneys fees and costs to which Complainant is entitled, then, is the total amount claimed for the presentation of both Complainant's and Kann's cases, less any attorney fees and costs paid with respect to Kann's case.

The Agency did not respond or object to Complainant's submission. Complainant requests an award of $74,767.50 in attorneys fees, and costs totaling $13,172.06, for a total award of fees and costs of $87,939.56. The attorney fee and cost award request is reasonable and complies with the requirements of 29 C.F.R. §1614.501(e).

---

[12] See footnote 2, above.

25

29 C.F.R. §1614.501(e)(2)(ii)(B) provides that, in limited circumstances, the attorney fees may be increased in consideration "of the degree of success, [and] quality of representation." Complainant and co-Complainant Kann prevailed on both of their claims of discrimination and retaliation. To prove her client's case, Complainant's attorney marshaled a complex set of facts pertaining to incidents that extended over a three year period of time and related to Complainant and co-Complainant Kann. I awarded Complainant (and co-Complainant Kann) the maximum amount of relief available for compensatory damages. I attribute Complainant's high degree of success in this matter to her attorney's highly competent representation. I further find that this case presents one of the limited circumstances in which it is reasonable to increase the fee award to reflect Complainant's success and competent representation.

I therefore increase the attorney fee award by an amount representing 20% of the total approved attorney fees of $74,767.50, which equals an increase in fees of $14,953.50, for total approved attorneys fees of $89,721.00. Therefore, the total adjusted and approved attorney fees ($89,721.00), including the increase pursuant to 29 C.F.R. §1614.501(e)(2)(ii)(B), plus approved costs ($13,172.06), equals $102,893.06 in approved total attorney fees and costs.

## VII.   CONCLUSIONS

A.      Complainant established a prima facie case of hostile work environment sexual harassment against the Agency.

B.      Complainant established a prima facie case of illegal retaliation and retaliatory harassment against the Agency.

C.      The Agency engaged in hostile work environment sexual harassment, illegal retaliation, and retaliatory harassment, in violation of Title VII of the Civil Rights Act of 1964.

D.      The Agency failed to establish entitlement to the affirmative defense to liability, and the Agency is therefore vicariously liable for the illegal actions of its employees.

E.      Complainant is entitled to restoration of all leave taken as a direct result of unlawful discrimination and retaliation. *Meagher v. Secretary of Defense*, EEOC Appeal No. 01923706 (1993).

F.      Complainant is entitled to $380,000.00 in non-pecuniary compensatory damages, reduced to the statutory cap of $300,000.00.

G.      Complainant is entitled to $102,893.06 in attorneys fees and costs, less any amount paid for attorneys fees and costs in the Kann case.

## VIII.    REMEDIES

A.    The Agency shall remit to Complainant all pay and/or benefits lost as a result of the Agency's discriminatory/retaliatory actions taken herein, assuming that, absent discrimination and/or retaliation, she would not have taken or used 150 hours of annual leave and 150 hours of sick leave. Accordingly, the Agency shall restore to Complainant 150 hours of annual leave, and 150 hours of sick leave, and any other benefits lost as a result of Complainant having used 150 hours of annual leave, and 150 hours of sick leave. The Agency shall restore the benefits due Complainant, pursuant to 29 C.F.R. §1614.501, no later than sixty (60) calendar days after the date this decision becomes final. Complainant shall cooperate in the Agency's efforts to compute the amount of benefits due, and shall provide all relevant information requested by the Agency. If there is a dispute regarding the exact amount of benefits, the Agency shall restore the undisputed amount of benefits to Complainant within sixty (60) calendar days of the date the Agency determines the amount it believes to be due. Complainant may petition for enforcement for the amount in dispute. The petition for enforcement must be filed with the Agency's EEO Director, in accordance with the provisions set forth below in the section entitled "Compliance with an Agency Final Action."

B.    Within sixty (60) days of the date this decision becomes final, the Agency shall pay Complainant's attorney the sum of $102,893.06 for attorney's fees and costs, less any amount paid for attorneys fees and costs in the Kann case.

C.    Within sixty (60) days of the date this decision becomes final, the Agency shall pay Complainant $300,000.00 in non-pecuniary damages to compensate Complainant for the pain and suffering she experienced as a result of the Agency's violation of Title VII.

D.    The Agency shall provide a minimum of eight hours of live, focused training to Charles Sims, Donald Gilman, Vern Ingraham, Mike Miller, and Lucy Querques-Denett on their responsibilities under the laws enforced by the EEOC, with special emphasis on Title VII. If Vern Ingraham, or any other person named above, is no longer an employee of the federal government, the Agency shall furnish documentation of his/her departure date.

E.    The Agency shall consider taking appropriate disciplinary action against Charles Sims, Donald Gilman, Vern Ingraham, Mike Miller and Lucy Querques-Denett. The EEOC does not consider training to be disciplinary action. If the Agency decides to take disciplinary action, it shall identify the action taken. As for Charles Sims, I consider the appropriate discipline to be his removal from federal service. If the Agency decides not to take disciplinary action, it shall set forth the reason(s) for its decision not to impose discipline. The Agency shall report its decision regarding imposing discipline to Administrative Judge Glenn G. Meyers. If Vern Ingraham, or any other person named above, is no longer an employee of the federal government, the Agency shall furnish

27

documentation of his/her departure date.

F.    The Agency shall post the notice, appended to this decision as Attachment A, (after being signed by the Agency's duly authorized representative) in conspicuous places, including all places where notices to employees are customarily posted. The Agency shall take reasonable steps to ensure that said notices are not altered, defaced, or covered by any other material. The original signed notice is to be submitted within 10 calendar days of implementation of this decision to the EEOC Denver District Office at the following address: Glenn G. Meyers, Administrative Judge, 303 East 17th Avenue, Suite 510, Denver, Colorado 80203-9634. The notices shall be posted within 30 days of implementation and shall remain posted for a period of 120 consecutive days.

Dated: Dec. 2, 2004

Glenn G. Meyers
Supervisory Administrative Judge

28

# Attachment A

# Notice

1.  This notice is being posted as part of the remedy pursuant to an EEOC Decision which found that hostile work environment harassment, based upon gender and retaliation, occurred at the Minerals Management Service division, in Lakewood, Colorado.

2.  Federal law gives our employees the right to be free from unlawful discrimination and/or retaliation.

Therefore:

**WE WILL NOT** engage in discrimination and/or retaliation against employees in contravention of the civil rights laws.

**WE WILL** or have already implemented the remedial action determined appropriate in the EEOC Decision.

We support and will comply with such federal laws in all respects and **Will Not** take any action against employees because they exercise any of their rights guaranteed by law.

Dated:_____     By: _____

# NOTICE TO THE PARTIES

### TO THE AGENCY:

Within forty (40) days of receiving this decision and the hearing record, you are required to issue a final order notifying the complainant whether or not you will fully implement this decision. You should also send a copy of your final order to the Administrative Judge.

Your final order must contain a notice of the complainant's right to appeal to the Office of Federal Operations, the right to file a civil action in a federal district court, the name of the proper defendant in any such lawsuit, the right to request the appointment of counsel and waiver of court costs or fees, and the applicable time limits for such appeal or lawsuit. A copy of EEOC Form 573 (Notice of Appeal/Petition) must be attached to your final order.

If your final order does not fully implement this decision, you must simultaneously file an appeal with the Office of Federal Operations in accordance with 29 C.F.R. 1614.403, and append a copy of your appeal to your final order. See EEOC Management Directive 110, November 9, 1999, Appendix O. You must also comply with the Interim Relief regulation set forth at 29 C.F.R. § 1614.505.

### TO THE COMPLAINANT:

You may file an appeal with the Commission's Office of Federal Operations when you receive a final order from the agency informing you whether the agency will or will not fully implement this decision. 29 C.F.R. § 1614.110(a). From the time you receive the agency's final order, you will have thirty (30) days to file an appeal. If the agency fails to issue a final order, you have the right to file your own appeal any time after the conclusion of the agency's (40) day period for issuing a final order. See EEO MD-110, 9-3. In either case, please attach a copy of this decision with your appeal.

Do not send your appeal to the Administrative Judge. Your appeal must be filed with the Office of Federal Operations at the address set forth below, and you must send a copy of your appeal to the agency at the same time that you file it with the Office of Federal Operations. In or attached to your appeal to the Office of Federal Operations, you must certify the date and method by which you sent a copy of your appeal to the agency.

### WHERE TO FILE AN APPEAL:

All appeals to the Commission must be filed by mail, hand delivery or facsimile.